IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PENDLETON DIVISION

| | |
|---|---|
| MAYA MILLER, | Case No. 2:18-cv-00762-SU |
| Plaintiff, | **OPINION AND ORDER** |
| v. | |
| ST. CHARLES HEALTH SYSTEM, INC., an Oregon Nonprofit corporation d/b/a St. Charles Prineville, | |
| Defendant. | |

SULLIVAN, United States Magistrate Judge:

Plaintiff brings this lawsuit pursuant to the Family and Medical Leave Act ("FMLA") 29 U.S.C. §§ 2615(a) and its state counterpart the Oregon Family Leave Act ("OFLA"), O.R.S. § 659A.183 against St. Charles Health System, Inc. Defendant has moved for summary judgment on all four of plaintiff's claims. (Docket No. 47). The parties have consented to allow a Magistrate

Judge to enter final orders and judgment in this case in accordance with Fed. R. Civ. P. 73 and 28 U.S.C. § 636(c). *See* (Docket No. 20). Oral argument was held on October 8, 2019. *See* (Docket No. 61). For the reasons set forth below, defendant's motion is DENIED.

## FACTUAL BACKGROUND

Plaintiff started working at the predecessor to St. Charles Prineville, Pioneer Memorial Hospital, in September 1999 ("the hospital"). First Amended Complaint ¶ 9 (Docket No. 44) ("FAC"). Plaintiff first began in a per diem position on the night shift and medical-surgical ward. Ames Decl. Ex. 2 (Miller Dep. Vol. I 27:20–23); Miller Decl. ¶ 1. She later transferred to a full-time position as an intensive care unit ("ICU") float nurse and then to a "resource nurse" position. *Id.* at (28:20–29:18). In the resource nurse position, plaintiff did not "have a patient load" and instead "cover[ed] the needs to all the hospital, [including] all of the departments." *Id.* at (29:12–18). Between 2006 and 2014, plaintiff regularly received positive performance reviews. Miller Decl. Exs. 1–7. Prior to 2016, plaintiff had "nothing in the way of discipline" with the exception of one incident from 2002. Becker Decl. Ex. 4 (Greene Dep. Ex. 12). In May 2016, plaintiff took FMLA leave to care for her ailing mother in Bulgaria. Miller Decl. ¶ 8; Becker Decl. Ex. 4 (Greene Dep. Exs. 1–2).[1] In a deposition, plaintiff testified she was familiar with the process for applying for protected leave. *See* Ames Decl. Ex. 2 (Miller Dep. Vol. I 132:5 – 18; Vol. II 282:22–283:3).

Sometime in 2015, as the hospital moved to a newly constructed building, plaintiff transitioned to a position in the emergency department ("ED"). Miller Decl. ¶ 7. In April or May 2016, Michael Greene ("Greene") became the Nurse Manager of the hospital's ED. Ames Decl. Ex. 2 (Miller Dep. Vol. I 36:8–9).

---

[1] Plaintiff additionally took FMLA leave in 2010, 2011 and 2012. *See* Ames Decl. Ex. 2 (Miller Dep. Vol II, Dep. Exs. 10–13).

The hospital used an incident reporting system, which is referred to by either of two acronyms: Safety Alert System ("SAS") or Event Management System ("EMS"). Ames Decl. Ex. 4 (Arbitration Excerpts 21:21–22:3). Through the reporting mechanisms, hospital employees can report patient safety concerns, with the option of filing anonymous reports, triggering investigations conducted by management. *Id.* at (22:17–22).

From April through the end of July 2016, the hospital received three such reports regarding plaintiff. On April 30, a SAS report alleged that plaintiff took a break without first ensuring the provider was fully informed of the treatment plaintiff had provided. Greene Decl. Ex. 1. On May 6, a SAS report alleged that plaintiff mishandled and mislabeled a patient's urine sample. Greene Decl. Ex. 2. On July 10, a caregiver sent an email concerning "a few complaints" he had received from a doctor in the ED: (1) plaintiff allegedly mismanaged a critical patient; and (2) plaintiff allegedly did not know how to "hang a propofol," which caused a different nurse "to come manage the drip because [the doctor] had no faith in [plaintiff's] ability to do it safely." Greene Decl. Ex. 3.

On July 27, Greene spoke with plaintiff and provided her with a documented "Verbal Coaching." Greene Decl. Ex. 4.

From August through the end of December 2016, the hospital received four additional SAS reports regarding plaintiff. On August 31, a SAS report alleged that plaintiff failed to properly dispose of a lorazepam syringe. Greene Decl. Ex. 5. On November 28, a SAS report alleged that, despite being asked to do so, plaintiff failed to repeat vital signs on a patient and reported that she had just done "them and they were fine." Greene Decl. Ex. 6. On December 10, two SAS reports were generated that alleged that plaintiff incorrectly retrieved medicine from the hospital's

management system and that plaintiff requested a medication that was intended for a different patient. Greene Decl. Exs. 7–8.

On December 19, plaintiff reported to her medical provider, in a regularly scheduled check-up, that her mother's health conditions were causing her increased stress. Miller Decl. Ex. 8 at 4.

On December 23, Greene spoke with plaintiff about the November 28 and December 10 incidents and followed-up by sending her an email later that day. Ames Decl. Ex. 2 (Miller Dep. Vol. I Ex. 5).

On February 10, 2017, plaintiff received her annual review assessing her performance from January 1, 2016, through December 31, 2016. Miller Decl. Ex. 9. Greene assessed the following in his portion of the review:

| "Goals - 'What you do'" | |
|---|---|
| "Safety" | "Solid (3)" |
| "Safety-Medication Administration" | "Solid (3)"[2] |
| "Service-Patient Satisfaction" | "Outstanding (4)" |
| "Quality" | "Solid (3)" |

*Id.* at 1–4.

| "Accountability - 'How you do it'" | |
|---|---|
| "Accountable for keeping commitments" | "Solid (3)" |
| "Acts professionally and receives feedback graciously, even when it's hard to hear" | "Marginal (2)" |
| "Acknowledges mistakes, learns from them and constantly works to improve" | "Marginal (2)" |
| "Asks for directions when not clear about expectations" | "Solid (3)" |

*Id.* at 4–5.

| "Caring - 'How you do it'" | |
|---|---|
| "Personalize each interaction in the workplace" | "Solid (3)" |

---

[2] The comment section noted that plaintiff's "med scan rate in 2015 was 71%. She achieved improvement to 82% in 2016." Becker Decl. Ex. 4 (Greene Dep. Ex. 9 at 2).

| "Treats others with respect, kindness and dignity" | "Commendable (4)" |
| --- | --- |
| "Listens and responds to others with empathy and thoughtfulness" | "Solid (3)" |
| "Shows appreciation to others through words and actions" | "Solid (3)" |

*Id.* at 5–6.

| "Teamwork - 'How you do it'" | |
| --- | --- |
| "Seeks different perspectives and appreciates diversity" | "Solid (3)" |
| "Works with others to provide a safe, respectful healing environment" | "Solid (3)" |
| "Offers to help others and asks for assistance when needed" | "Marginal (2)" |
| "Acknowledges the talents and contributions of the team" | "Solid (3)" |

*Id.* at 6. In the "Overall Evaluation Comments" section of the review, Greene noted that plaintiff had "shown improvement in med scanning in 2016," took "direction from the ED coordinator well, demonstrate[d] follow-thru [sic] with assigned tasks and has taken initiative to work with ED Coordinators on triaging waiting room patients," but that she "could communicate urgency and priorities with peers better[.]" *Id.* at 8.

In February 2017, four incidents were the subject of SAS reports involving plaintiff. On February 10, a SAS report alleged that plaintiff failed to properly order a procedure for a patient. Greene Decl. Ex. 10. On February 11, plaintiff self-reported that she administered aspirin to a patient with chest pain. Greene Decl. Ex. 11. On February 18, a SAS report alleged plaintiff discharged a patient without notifying the patient's physician. Greene Decl. Ex. 12. On February 19, a SAS report alleged plaintiff administered the wrong dosage of medication to a patient. Greene Decl. Ex. 13.

After becoming aware of the February incidents, Greene arranged to meet with plaintiff. *See* Becker Decl. Ex. 4 (Greene Dep. Ex. 10). On March 2, Greene met with plaintiff to discuss

the incidents; Human Resources ("HR") partner, Matt Oakes ("Oakes"), and plaintiff's Oregon Nurses Association Union ("ONA") Representative, Courtney Niebel ("Niebel") also attended the meeting. Ames Decl. Ex. 6 (Oakes. Dep. 8:8–11; 29:3–5).[3] That same day, email correspondence between Greene, hospital management, and HR staff indicated that although "[t]ermination was not on the table," and "remedial education & testing" was warranted, a "final written corrective action with a performance plan" would likely be administered. Becker Decl. Ex. 4 (Greene Dep. Ex. 12).

Oakes testified that the purpose of the meeting was to provide plaintiff with an opportunity to present "her side of the story" and provide additional information to help the hospital understand why "those events occurred." Ames Decl. Ex. 6 (Oakes Dep. 29:7–11). The meeting resulted in a two-week administrative suspension. *See id.* at (29:18–21). After the meeting, plaintiff asked Greene for permission to "take leave to care for [her] mother in Bulgaria" and that she was "prepared to take leave immediately[.]" Miller Decl. ¶ 16. In response to her request, Greene said that she could not take leave while she "was already on administrative leave." *Id.* at ¶ 17. The hospital's handbook directs supervisors to "work with Human Resources and designated third party leave administrator in providing [FMLA] leaves of absence." Miller Decl. Ex. 11.

The following day, March 3, Greene completed a seven-page investigative report analyzing the February 2017 SAS reports.[4] Becker Decl. Ex. 5 (Greene Dep. Ex. 13); *see also* Greene Decl.

---

[3] The Oakes deposition transcript misidentified Courtney Niebel as "the Unum rep." *Id.* at (29:3–5). However, as both parties refer to Courtney Niebel as plaintiff's union representative, and the record contains evidence listing "Courtney Niebel" as the ONA union representative for the hospital, the Court assumes the Oakes deposition transcript erroneously stated "Unum rep" where it instead should have stated "union rep." *See* Ames Decl. Ex. 1.

[4] Defendant also seems to assert that Greene's investigation included additional allegations, stemming from incidents on the "[w]eekend of 2/25-26." Def.'s Mot. Summ. J. 9 (citing Greene Decl. Ex. 14). A review of the seven-page investigative report defendant cites does not appear to discuss the February 25 and/or 26 incidents; however, the events described do appear in plaintiff's

Ex. 15. Greene concluded that plaintiff "failed to follow standard work" procedures as shown in the February 10, 11, 18, and 19 SAS Reports. Becker Decl. Ex. 5 (Greene Dep. Ex. 13 at 1–7). He recommended termination. *Id.* at 7.

As a result of Greene's investigative report, plaintiff, Greene, Oakes, and Niebel met on March 15 and plaintiff was issued a final written warning. Ames Decl. Ex. 6 (Oakes Dep. 30:5–14). In order to return to work, plaintiff was to be monitored by an assigned nurse leader for two shifts and was required to complete nine "competencies." Ames Decl. Ex. 2 (Miller Dep Vol. I, Dep. Ex. 6). During the meeting, plaintiff "made a request for leave to care for her mother[.]" Miller Decl. ¶ 20. Greene instructed plaintiff the date of her next shift and that she "needed to complete two competencies before taking leave." *Id.*

On March 17 and 18, plaintiff successfully completed her competencies. Miller Decl. ¶ 21; Ames Decl. Ex. 6 (Oakes Dep. 45:2–8). Plaintiff then asked Greene "for permission to take leave to care for [her] mother," to which Greene directed plaintiff to contact human resources. Miller Decl. ¶ 21. Plaintiff "attempted to contact human resources multiple times between March 18 and March 24, 2017, including leaving voicemails and requesting return phone calls." *Id.* at ¶ 22. On March 24, an HR employee contacted plaintiff about her request for leave and plaintiff contacted the hospital's third-party leave contractor, Unum. *Id.* at ¶ 23. Plaintiff requested leave beginning March 25 for her "own serious health condition." Miller Decl. Ex. 13 at 2. On March 27, Unum informed plaintiff that she was eligible for leave "[a]s of the date of [her] request," pending certification. *Id.* at 7. Plaintiff also requested beginning April 7 for her "parent's serious health

---

"Notice of Discharge." Ames Decl. Ex. 2 (Miller Dep. Ex. 7); *see also id.* Ex. 6 (Oakes Dep. 30:9–14) (discussing "other incidents that had been reported previous to the suspension or right at the end of [plaintiff's] last few shifts" at the March 15 meeting).

condition." Miller Decl. Ex. 13 at 1. Unum similarly informed plaintiff, on March 27, that she was eligible for leave "[a]s of the date of [her] request," pending certification." *Id.* at 3.

On March 19, the day after completing her competencies, Greene wrote in a SAS report that plaintiff failed to follow a physician's order in removing a catheter. Greene Decl. Ex. 16 On March 26, a SAS report alleged that plaintiff left the door to the medication management system unlocked and unattended.[5] *Id.* Based on these incidents, the hospital elected to take disciplinary action. Ames Decl. Ex. 6 (Oakes Dep. 45:9–15).

On April 3, plaintiff, Greene, Oakes, and Niebel met to discuss the SAS reports "to get an understanding of [plaintiff's] side of the story." *Id.* at (Oakes Dep. 46:3–10); *see also* Notice of Discharge at 1. In plaintiff's Notice of Discharge, plaintiff disputed Greene's account of the March 19 incident and stated the catheter "fell out." Ames Decl. Ex. 2 (Miller Dep. Ex. 7 at 4) ("Notice of Discharge"). The Notice of Discharge also includes an incident, undated, alleging that plaintiff sent a lab specimen for testing without her initials, time, or date. Notice of Discharge at 4. On April 5, the hospital terminated plaintiff's employment:

> After a review and careful consideration of recent events, the frequency and nature of mistakes, which included repeated "at-risk" behavior, recklessness, and the potential for patient harm, requires action be taken to ensure the safety of our patients. Therefore, your employment at St. Charles will be terminated, effective today, April 5, 2017.

Notice of Discharge at 1.

The day after plaintiff was discharged, she saw a psychiatrist to obtain documentation for the certification of her own serious health condition. Ames Decl. Ex. 3 (Miller Dep. Vol. II 350:7–

---

[5] The Court notes that the SAS report for this incident does not appear in the record supplied by the parties. However, plaintiff's Notice of Discharge includes a description of the incident with the notation, "SAS Entered." Notice of Discharge at 4.

Page 8 – OPINION AND ORDER

20). Shortly thereafter, plaintiff flew to Bulgaria to care for her mother who had suffered a heart attack. Miller Decl. ¶ 27. In Bulgaria, plaintiff completed the certification documentation for her mother's serious health condition. *Id.* at ¶ 28; Ex. 16.

## LEGAL STANDARD

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, affidavits, and admissions on file, if any, show "that there is no genuine dispute as to any material fact and the [moving party] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Substantive law on an issue determines the materiality of a fact. *T.W. Elec. Servs., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). Whether the evidence is such that a reasonable jury could return a verdict for the nonmoving party determines the authenticity of the dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The moving party has the burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Id.* at 324.

Special rules of construction apply when evaluating a summary judgment motion: (1) all reasonable doubts as to the existence of genuine issues of material fact should be resolved against the moving party; and (2) all inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. *T.W. Elec.*, 809 F.2d at 630.

## DISCUSSION

Congress enacted the FMLA in 1993 with the intent of achieving "a balance that reflected the needs of both employees and their employers." *Bachelder v. Am. W. Airlines, Inc.*, 259 F.3d 1112, 1119 (9th Cir. 2001). The declared purpose of the FMLA is:

> (1) to balance the demands of the workplace with the needs of families, to promote the stability and economic security of families, and to promote national interests in preserving family integrity;
>
> (2) to entitle employees to take reasonable leave for medical reasons, for the birth or adoption of a child, and for the care of a child, spouse, or parent who has a serious health condition;
>
> (3) to accomplish the purposes described in paragraphs (1) and (2) in a manner that accommodates the legitimate interests of employers.

*Sanders v. City of Newport*, 657 F.3d 772, 776–77 (9th Cir. 2011) (quoting 29 U.S.C. § 2601(b)).

The FMLA "creates two interrelated substantive rights for employees." *Xin Liu v. Amway Corp.*, 347 F.3d 1125, 1132 (9th Cir. 2003). "[F]irst, the employee has a right to use a certain amount of leave for protected reasons, and second, the employee has a right to return to his or her job or an equivalent job after using protected leave." *Bachelder*, 259 F.3d at 1122. To vindicate those rights, the courts have recognized two theories of recovery relevant here: (1) interference claims, when an employer interferes with an employee's exercise of rights under the FMLA, 29 U.S.C. § 2615(a)(1); and (2) discrimination claims, when an employer discriminates against an employee for opposing any practice prohibited by the FMLA, 29 U.S.C. § 2615(a)(2). *Bachelder*, 259 F.3d at 1124; *see also Benz v. W. Linn Paper Co.*, 803 F. Supp. 2d 1231, 1249 (D. Or. 2011).

Plaintiff brings four claims for relief. Claim I is an interference claim under the FMLA, 29 U.S.C. § 2615(a)(1); claim III, also an interference claim, is brought under OFLA, ORS § 659A.183(1). Claim II is discrimination claim under FMLA; claim IV, also a discrimination claim, is brought under OFLA, ORS § 659A.183(1). Defendant moves for summary judgment on all four of plaintiff's claims. For the reasons explained below, defendant's Motion for Summary Judgment is DENIED.

As a threshold matter, because courts construe the OFLA "to the extent possible in a manner that is consistent with any similar provisions of the federal" FMLA, the Court will analyze plaintiff's FMLA and OFLA claims together. ORS § 659A.186(2); *see also Sanders v. City of Newport*, 657 F.3d 772, 783 (9th Cir. 2011) ("In light of these similar statutory and regulatory provisions, the district court properly applied the same legal standards under FMLA to Sanders's OFLA claim."). Therefore, the Court's references to the "interference" claims refer plaintiff's first claim for relief under the FMLA and third claim for relief under the OFLA. Similarly, the Court's references to the "discrimination" claims refers to plaintiff's second claim for relief under the FMLA and fourth claim for relief under the OFLA.

## I. Interference Claims (First and Third Claims for Relief)

"Examples of interference include denying leave, discouraging an employee from using leave, and using the taking of leave as a negative factor in employment actions." *Walker v. T-Mobile USA, Inc.*, No. 06-cv-00687-KI, 2007 WL 2982267, at *7 (D. Or. Oct. 5, 2007) (citation omitted), *aff'd sub nom.*, 298 F. App'x 665 (9th Cir. 2008). The parties agree that to prevail on her interference claim, plaintiff must prove that: (1) she "was eligible for the FMLA's protections"; (2) her "employer was covered by the FMLA"; (3) she "was entitled to leave under the FMLA"; (4) she "provided sufficient notice of [her] intent to take leave"; and (5) her "employer denied [her] FMLA benefits to which [she] was entitled." *Sanders*, 657 F.3d at 778. Def.'s Mot. Summ. J. 19; Pl.'s Opp'n 19. Defendant does not contest that plaintiff was eligible for the FMLA's protections and that the hospital was a covered employer. Def.'s Reply 2 n.2.[6] Finally, a plaintiff "can prove

---

[6] While defendant does not specifically concede plaintiff was entitled to take leave under the FMLA, its Reply does not contest the issue. In any event, the Court finds plaintiff was entitled to take leave under the FMLA given the hospital's third-party leave administrator provider so found. Miller Decl. Ex. 13.

this claim, as one might any ordinary statutory claim, by using either direct or circumstantial evidence, or both." *Bachalder*, 259 F.3d at 1125.

A. Notice

When an employee seeks to take FMLA leave, she "shall provide at least verbal notice sufficient to make the employer aware that the employee needs FMLA-qualifying leave, and the anticipated timing and duration of the leave." 29 C.F.R. §§ 825.302(c). The same regulation instructs that "the employer should inquire further of the employee if it is necessary to have more information about whether FMLA leave is being sought by the employee, and obtain the necessary details of the leave to be taken." *Id.* "However, Oregon's OFLA regulation goes one step further; it is not instructive, but is mandatory as to the employer's duty." *Gay v. Blount, Inc.*, No. 10-cv-773-ST, 2011 WL 2420368, at *5 (D. Or. Apr. 28, 2011), *report and recommendation adopted*, 2011 WL 2413477 (D. Or. June 13, 2011).

Plaintiff highlights two meetings in March 2017 where she expressed her desire to take FMLA leave. *See* Miller Decl. ¶¶ 16, 20; *id.* Ex. 12. After the conclusion of the March 2, 2017 meeting to discuss the February 2017 SAS reports, plaintiff expressly asked Greene for permission to "take leave to care for [her] mother in Bulgaria" and Greene responded that she could not take leave while she "was already on administrative leave." Miller Decl. ¶¶ 16–17. Similarly, during the March 15 meeting plaintiff "made a request for leave to care for her mother"; however, Greene responded that plaintiff "needed to complete two competencies before taking leave." Miller Decl. ¶ 20. To the extent Greene—or the HR partner present at both meetings, Oakes—required "more information about whether FMLA leave [was] being sought," they were required to inquire further. *See* 29 C.F.R. §§ 825.302(c); *see also Gay*, 2011 WL 2420368, at *5.

In its reply, defendant asserts plaintiff cannot show that she gave sufficient notice, relying primarily on plaintiff's familiarity with the leave request process and her deposition testimony that plaintiff knew contacting Unum was the first step in requesting FMLA leave. Def.'s Reply 2–3, 6–8. Defendant asserts that "the first time [plaintiff] contacted Unum for the leave in question was March 24, 2017[.]" *Id.* at 6. That assertion, however, ignores the express statement from Greene to plaintiff that she was ineligible for leave while she was on administrative leave, Miller Decl. ¶17; *see also id.* at ¶¶ 20–21, and that Greene indicated that she had to successfully complete her competencies before taking leave. *Id.*[7] Viewing these facts in the light most favorable to plaintiff, a genuine issue of material fact exists. *See Price v. Multnomah Cty.*, 132 F. Supp. 2d 1290, 1297 (D. Or. 2001) (finding "disputed issue of fact" where the plaintiff "claim[ed] that he presented an FMLA request to [his supervisor], which [the supervisor] denie[d]").

The Court is unpersuaded by defendant's reliance on *Dezsofi v. USF Reddaway, Inc.*, No. 06-cv-6051-TC, 2007 WL 1975633 (D. Or. July 6, 2007). In *Dezsofi*, the plaintiff brought FMLA and OFLA claims against his employer where his manager "refused to provide [the plaintiff] with requested paperwork to process" the plaintiff's leave. *Id.* at *4. Defendant is correct that, as here, the manager in *Dezsofi* was not authorized to process FMLA leave request and that the plaintiff in *Dezsofi* knew his HR representative "was the appropriate contact for FMLA paperwork requests." *Id.* at *5. However, *Dezsofi's* rationale for concluding the facts before it did "not present

---

[7] At oral argument, counsel for defendant represented that Greene denied that he had made any statement on March 2 regarding plaintiff's request for FMLA leave. Hearing (17:6–18:7) (Docket No. 65). However, as counsel for plaintiff pointed out, defendant's briefing acknowledged that plaintiff "raised her mother's illness" at the March 2 meeting. *Id.* (24:8–22); *see also* Def.'s Mot. Summ. J. 16 ("Miller raised her mother's illness in her March and March 15, 2017 disciplinary meetings as an explanation for her stress, but she did not initiate the FMLA process."); Def.'s Reply 8 n.6 ("Although St. Charles disputes Miller made such a request of Mr. Greene or Mr. Oakes, it will assume she did for the purposes of summary judgment only.").

interference with [the plaintiff's] ability to request FMLA leave" rested primarily on the fact that the manager "was immediately reprimanded and apologized the next day, and [the plaintiff] was granted the requested leave without further incident." *Id.* The Court finds those facts sufficiently distinguishable to render *Dezsofi* inapposite.

In sum, the Court finds a genuine issue of material fact exists as to whether plaintiff sufficiently supplied notice of her FMLA leave request. *See Varese v. Clatsop Behavioral Healthcare*, No. 3:16-cv-00738-AA, 2018 WL 1513271, at *6 (D. Or. Mar. 27, 2018) ("Reasonable jurors could find that plaintiff's notice was sufficient under FMLA."), *appeal dismissed*, No. 18-35317, 2018 WL 8108925 (9th Cir. Nov. 1, 2018).

### B. Denial of Leave

Defendant's Motion for Summary Judgment does not squarely address the elements of an interference claim. Defendant contends that the FMLA does not prohibit employers from disciplining or discharging employees for reasons unrelated to protected leave. Def.'s Mot. Summ. J. 19–20 ("In a termination case, the proper inquiry is 'only whether the employer fired [her] based on their assessment of the terminable offense, rather than for a reason prohibited by the FMLA.'") (citing *Perez-Denison v. Kaiser Found. Health Plan of the Nw.*, 868 F. Supp. 2d 1065, 1080–81 (D. Or. 2012) (bracketing in original)).

Plaintiff's FAC asserts that plaintiff was "denied a benefit to which she was entitled under FMLA" *and* that she "was terminated . . . as a result of Defendant's interference or denial" of FMLA leave. FAC ¶¶ 47–48; *see also* ¶ 63 ("Defendant interfered with and denied Plaintiff's leave, to which she was entitled under the OFLA."). Plaintiff's claims do not rely solely on her allegation that she was terminated as a result of her FMLA leave request. Rather, she also advances a theory that the *denial* of her requests for protected leave interfered with her rights. *See* Pl.'s

Opp'n 24 (plaintiff "asked Greene for permission to use that time to travel to Bulgaria to care for her mother's serious medical needs . . . . In response, Greene said no because she was already on administrative leave.").

Under 29 U.S.C. § 2615(a)(1), a plaintiff may bring an interference claim under a theory that her employer denied her FMLA leave *and* under a theory that her "FMLA leave [was] a factor in its decision to terminate her." *Xin Liu*, 347 F.3d at 1133 (alleging interference claim under § 2615(a)(1) for "(1) denying . . . FMLA leave *and* (2) using her protected FMLA leave as a factor in its decision to terminate her") (emphasis added; footnotes omitted).

In its Reply, defendant asserts that plaintiff "cannot show that she was denied leave" and "cannot prove ***any*** causal nexus between her termination and request for protected leave." Def.'s Reply 2 (citation omitted; emphasis in original). The Court disagrees. As already discussed above, there is a triable issue of fact as to whether Greene's statements to plaintiff that she could not take FMLA leave constituted a denial of her "FMLA benefits to which [she] was entitled." *Sanders*, 657 F.3d at 778; *see also Farrell v. Tri-Cty. Metro. Transp. Dist. of Or.*, No. 04-cv-00296-HA, 2005 WL 1307695, at *5 (D. Or. May 31, 2005) ("An employer interferes with an employee's rights under the FMLA if it *refuses to authorize* FMLA leave or discourages an employee from using such leave.") (emphasis added) (citing 29 C.F.R. § 825.220). Accordingly, summary judgment is not appropriate as to plaintiff's theory that she was denied FMLA leave.

Plaintiff argues that her FMLA leave was impermissibly considered in the decision to terminate her. In order to prove that defendant's decision was impermissible, she must establish:

> by a preponderance of the evidence that her taking of FMLA-protected leave constituted a negative factor in the decision to terminate her. She can prove this claim, as one might any ordinary statutory claim, by using either direct or circumstantial evidence, or both.

*Xin Liu*, 347 F.3d at 1136.

Plaintiff does not explicitly allege in her FAC that her planned FMLA-protected leave was "negative factor" in the hospital's termination decision in the context of her first and third claims for relief. However, she does assert that, during the March 2, 2017 meeting, there was a consensus that "[t]ermination [was] not on the table," but that, after her request for leave Greene completed his investigation and subsequently recommended termination. Pl.'s Opp'n 24 (citing Miller Decl. ¶ 16; Ames Decl. Ex. 5 (Greene Dep. Ex. 13).

Temporal proximity between a request for FMLA-protected leave and an adverse employment action can support an inference of causation. *Xin Liu,* 347 F.3d at 1137. Temporal proximity alone is generally not sufficient to establish a claim if the timing "does nothing to refute . . . the proffered legitimate reasons" for the adverse employment action. *Hashimoto v. Dalton*, 118 F.3d 671, 680 (9th Cir. 1997); *see also Larmanger v. Kaiser Found. Health Plan of the Nw.*, 585 F. App'x 578 (9th Cir. 2014) ("Proximity alone, however, is insufficient to establish a triable issue given that: (1) there is no other direct or circumstantial evidence of a causal nexus; (2) the corrective action and termination were put in motion before [the employee's] requested or used medical leave; and (3) the adverse actions were amply supported by legitimate concerns about [the employee's] work performance.").

Defendant asserts that the hospital terminated plaintiff's employment based on performance related issues, resulting in escalating discipline that culminated in plaintiff's termination, and that she "lacks any evidence to demonstrate her FMLA leave request was a negative factor in the decision to terminate her." Def.'s Mot. Summ. J. 20–21. In discussing the chronology of her request for leave and Greene's termination recommendation, plaintiff articulates a specific argument as to how her request for leave was a negative factor in the decision to

terminate her employment as to her first and third claims for relief.[8] *Cf. Varese v. Clatsop Behavioral Healthcare*, No. 3:16-cv-00738-AA, 2018 WL 1513271, at *7 (D. Or. Mar. 27, 2018) (granting summary judgment for employer where the "record demonstrate[d] that plaintiff was on the road to termination well before she invoked her right to protected medical leave and irrespective of her decision to do so," and noting that "plaintiff [had] introduced no evidence other than temporal proximity to bolster her claim that her leave was a negative factor in the employment decision"), *appeal dismissed*, No. 18-35317, 2018 WL 8108925 (9th Cir. Nov. 1, 2018). As such, viewing the facts and drawing inferences in the light most favorable to the nonmoving party, summary judgment is not appropriate as to plaintiff's negative factor theory in her first and third claims for relief. Additionally, the Court notes plaintiff's related argument under her second and fourth claims for relief.

In sum, defendant's motion for summary judgment as to plaintiff's interference claims is denied.

## II.     Discrimination Claims (Second and Fourth Claims for Relief)

Section 2615(a)(2) makes it "unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by" the FMLA. *Id.* at § 2615(a)(2). To prevail on a discrimination claim, the plaintiff has to show "(1) involvement in a protected activity under the FMLA; (2) an adverse employment action; and (3) a causal link between the protected activity and the employment action." *Schultz*, 970 F. Supp.2d at 1059. An adverse action in the context of retaliation claims is "any action that is 'reasonably likely

---

[8] There is evidence in the record that could support the argument, such as Oakes deposition testimony about how the hospital could benefit from delaying or ignoring plaintiff's request. *See* Ames Decl. Ex. 6 (Oakes. Dep. 40:16–41:2). This evidence is discussed in greater detail in Section II.

to deter employees from engaging in protected activity.'" *deBarros v. Wal-Mart Stores*, No. 6:11-cv-06116-AA, 2013 WL 3199670, at *6 (D.Or. June 19, 2013) (quoting *Ray v. Henderson*, 217 F.3d 1234, 1243 (9th Cir. 2000)). In this circuit, courts apply "the *McDonnell Douglas* burden shifting framework when analyzing FMLA retaliation claims." *Schultz*, 970 F.Supp.2d at 1058; *see also deBarros*, 2013 WL 3199670, at * 4 (applying the *McDonnell Douglas* burden shifting framework to claims brought under both §§ 2615(a)(2) and (b)).

In plaintiff's Response, she asserts that the "crux of [her] allegation under this claim is that Defendant discriminated against her and visited *negative consequences* upon [her] because she attempted to exercise FMLA rights." Pl.'s Opp'n 27 (emphasis added). Plaintiff cites 29 C.F.R. § 825.220(c) and invokes language from the Ninth Circuit's decision in *Bachelder* and argues her request for leave was impermissibly considered as a negative factor in her termination properly brought under section 2615(a)(1). *Id.* at 27–30 (citing *Bachelder*, 259 F.3d 1112, 1124 (9th Cir. 2001)).[9]

### A. Negative Factor Theory

Plaintiff maintains that at trial, she need only show by a preponderance of the evidence that "her exercise of FMLA rights constituted a negative factor in the Hospital's decision to terminate her employment." Pl.'s Opp'n 28. In order to prevail under this theory, plaintiff must show "by a preponderance of the evidence that her [request to take] FMLA-protected leave constituted a negative factor in the decision to terminate her. She can prove this claim, as one might any ordinary statutory claim, by using either direct or circumstantial evidence, or both." *Bachelder*, 259 F.3d at 1125.

---

[9] Defendant urges the Court to consider this an "additional legal theory" presented by plaintiff. After a review of the FAC and the briefing, however, the Court declines to do so.

Plaintiff asserts that the following circumstantial evidence shows that the hospital considered her leave request as a factor in its decision to terminate her employment:

- Her positive job evaluation for 2016. Becker Decl. Ex. 5 (Greene Dep. Ex. 9).

- The March 2, 2017 email correspondence she argues shows "nothing in the way of discipline in her file except" for an incident in 2002; discussion of "a suspension pending a performance improvement plan/remedial education"; and Oakes' remark that "termination [was] not on this table at this point." *Id.* (Greene Dep. Ex. 12);

- Plaintiff's request to Greene for permission to take leave and Greene's denial of her request on March 2, 2017, Miller Decl. ¶¶ 16–17, and Greene's termination recommendation the following day. Becker Decl. Ex. 5 (Greene Dep. Ex. 13)'

- Oakes' email stating that his "concern is that the union or arbitrator will be able to say that her performance has taken such a dramatic dip due to her mother being sick – or that we terminated her right when she was getting ready to take protected leave." *Id.* (Greene Dep. Ex. 23);

- Oakes' statement at the April 5, 2017 meeting, that plaintiff's "leave was for a future date of 4/7 so [we] decided to take action now rather than waiting for you to return[.]" Miller Decl. ¶ 15.

In its Reply to plaintiff's "negative factor" theory, defendant notes that employers are permitted to take disciplinary action, including termination, for conduct unrelated to FMLA leave. Def.'s Reply 5 (citing *Perez-Denison*, 868 F. Supp. 2d at 1080–81). Defendant asserts that the summary judgment record demonstrates that plaintiff's disciplinary process began months before her request for leave and that her termination was the result of the eleven incidents described in her Notice of Discharge. Moreover, argues defendant, plaintiff does not dispute the eleven incidents outlined in her notice of discharge.

As noted, temporal proximity alone is ordinarily insufficient to refute "the proffered legitimate reasons" by an employer for an adverse employment action. *Hashimoto*, 118 F.3d at 680. However, temporal proximity can provide an evidentiary basis from which an inference of causation may be drawn. *Cf. Porter v. Cal. Dep't of Corr.,* 419 F.3d 885, 895 (9th Cir. 2005); *see*

*also Xin Liu*, 347 F.3d 1137 (concluding the plaintiff had raised a triable issue of material fact where, *inter alia*, employer repeatedly denied leave and "the proximity in time between the leave and her termination" provided "supporting evidence of a connection between the two events").

Viewing the evidence adduced by both parties in the light most favorable to plaintiff, the Court cannot conclude that a rationale juror would be unable to find that the hospital considered plaintiff's leave request as a factor in its decision to terminate her employment. Significantly, Greene's investigation, concluded on the day immediately following plaintiff's FMLA leave request and recommended termination. Further, Oakes' statements statement at the April 5, 2017 meeting, as chronicled in the notes from plaintiff's union representative and undisputed in this summary judgment record, could allow a rationale juror to conclude that plaintiff's pending-FMLA leave was a factor in the decision to terminate her employment.

As such, viewing the facts and drawing all inferences in the light most favorable to the plaintiff, the Court finds summary judgment inappropriate on plaintiff's negative factor theory claim.

## CONCLUSION

For the reasons set forth above, defendant's motion for summary judgment (Docket No. 47) is DENIED, as described above.

IT IS SO ORDERED.

DATED this 16th day of December, 2019.

/s/ Patricia Sullivan
PATRICIA SULLIVAN
United States Magistrate Judge